**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

**WILSON, INC. d/b/a HAGERSTOWN HONDA,**

*Plaintiff,*

v.

**AMERICAN HONDA MOTOR CO., INC.,**

and

**JOHN DOE DEALERSHIP**
d/b/a CMA'S HONDA OF MARTINSBURG,

*Defendants.*

Civil Action No. ______________

**VERIFIED COMPLAINT FOR**
**DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND DAMAGES**

Plaintiff Wilson, Inc. d/b/a Hagerstown Honda ("Hagerstown Honda" or "Plaintiff"), by its undersigned counsel, files this Verified Complaint against Defendant American Honda Motor Co., Inc. ("AHM") and Defendant the Doe Dealership d/b/a CMA's Honda of Martinsburg ("CMA"), and states:

**NATURE OF THE ACTION**

1. For more than 35 years, Hagerstown Honda has done exactly what its franchise requires: it has promoted, sold, and serviced Honda vehicles throughout the tri-state market that AHM itself assigned to it, building one of the best-performing dealerships in AHM's own district. AHM has now decided to take that market away — not by lawful process, but by fiat. By a three-sentence letter dated July 15, 2026, prepared and shipped before the date it bears, AHM announced

that a competing Honda dealership will open on September 1, 2026, at a site 18.84 air miles from Plaintiff's door (the "Point"), within or immediately at the boundary of Plaintiff's assigned territory and inside a ZIP code AHM expressly assigned to Plaintiff.

2. AHM disclosed no criteria, no data, no market study, and no process. When Plaintiff's President asked for a telephone call the morning the letter arrived, no one called. When Plaintiff's counsel invoked the mandatory dispute-resolution provision AHM drafted, AHM said the message would be returned — and for weeks it never was; the only response ever to come arrived on August 11, 2026, from outside litigation counsel, refusing the requested materials. (Ex. O.) The appointee AHM selected is led by a former AHM field representative for this very market, and it is already marketing the new store to the public.

3. The announcement is the final step in a course of conduct that Maryland law forbids. Throughout 2025 and 2026, AHM restricted Plaintiff's vehicle allocation — a dealer's very life-blood — while grading Plaintiff against a "Retail Sales Effectiveness" construct that measures this rural, mountainous market by the sales averages of Washington, D.C.-area dealers. AHM's own District Sales Manager admitted in writing that Plaintiff's "area does not have the demand of other areas." AHM starved the dealership of inventory, recorded the resulting shortfall as the dealer's failure, and now proposes to use that manufactured deficit to justify planting a competitor in Plaintiff's market. Maryland law places on AHM the burden of proving that its market-area design and performance standards are fair, reasonable, equitable, and based on accurate information, Md. Code Ann., Transp. § 15-207(e), and that its allocation system is reasonable and fair for all dealers, id. § 15-208(f). AHM cannot carry either burden, and it has refused even to try.

4. Plaintiff seeks declaratory relief, damages and attorneys' fees under Md. Code Ann., Transp. § 15-213, and temporary, preliminary, and permanent injunctive relief preserving

the status quo — the market structure that has existed for decades — until AHM's conduct can be adjudicated by this Court and, pursuant to Transp. § 15-214, by the Maryland Motor Vehicle Administration.

**PARTIES, JURISDICTION, AND VENUE**

5. Plaintiff Wilson, Inc. is a Maryland corporation with its principal place of business at 10307 Auto Place, Hagerstown, Washington County, Maryland, and is a citizen of Maryland. It has operated Hagerstown Honda, authorized Honda dealer no. 207865, for more than 35 years under successive Honda Automobile Dealer Sales and Service Agreements. It is a family business: H. Paul Ritchie is President; his son Jacob Paul Ritchie is Vice President and Treasurer. The dealership premises are leased from Moland LLC.

6. Defendant AHM is a California corporation with its principal place of business in Torrance, California, and is a citizen of California. AHM is the exclusive distributor of Honda motor vehicles in the United States and is a "manufacturer" or "distributor" within the meaning of Md. Code Ann., Transp. § 15-201 et seq. AHM controls, as to Plaintiff, every consequential lever of the franchise: vehicle allocation, market-area assignment, performance measurement, incentive administration, and customer-lead routing.

7. Defendant the Doe Dealership is, on information and belief, an entity within the Carter Myers Automotive group, whose Chief Executive Officer is Liza Myers Borches, with its principal place of business in Martinsburg, West Virginia, and which, on information and belief, is not a citizen of Maryland. On information and belief, the Point will operate at the site of CMA's existing Martinsburg Chrysler-Dodge-Jeep-Ram dealership at 48 Kelly Island Road.

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1): complete diversity exists and the amount in controversy far exceeds $75,000. Declaratory relief is authorized

by 28 U.S.C. §§ 2201–2202 and injunctive relief by Fed. R. Civ. P. 65. This Court has personal jurisdiction over AHM, which systematically transacts business throughout Maryland, maintains continuing franchise relationships with Maryland dealers including Plaintiff, and directed the conduct at issue at a Maryland dealer with effects felt in Maryland. Personal jurisdiction over the Doe Dealership rests on its conduct purposefully directed at Maryland in connection with the proposed dealership and the effects of that conduct in this District. Venue is proper under 28 U.S.C. § 1391(b)(2), and assignment to the Northern Division is proper because the action arises in Washington County.

## FACTS

### A. The Franchise and the Assigned Market

9. Plaintiff operates under a Dealer Agreement dated January 1, 2025, with a term through December 31, 2029. (Ex. A.) Section 17.8 assigns Plaintiff responsibility for the promotion, retail sale, and servicing of Honda products within its Area of Statistical Analysis (“ASA”), and conditions AHM's reserved right to appoint additional dealers on the use of “reasonable criteria.” Section 22 obligates AHM to make “every good faith effort” to resolve disputes arising under the Dealer Agreement or applicable law fairly, promptly, and so as to minimize disruption of Plaintiff's business.

10. By Notice of Dealer Area of Statistical Analysis dated August 22, 2022 and effective January 3, 2023 (Ex. B), AHM assigned Plaintiff a territory of designated census tracts and ZIP codes spanning Frederick and Washington Counties, Maryland, and Berkeley, Jefferson, and Morgan Counties, West Virginia — expressly including Martinsburg ZIP codes 25401, 25403, and 25404. ZIP code 25401 is the ZIP code of the Point. The Notice states that the ASA “will be used by American Honda for purposes of evaluating Dealer's sales performance,” and repeats,

verbatim, the “reasonable criteria” limitation of Section 17.8. No modification of the ASA has been noticed since. Twice, in the two operative instruments defining the market relationship, AHM bound itself to the same standard: reasonable criteria.

11. In reliance on its assigned market, Plaintiff has invested continuously for decades in facilities, inventory, trained sales and service personnel, and advertising directed at the entire territory, including its West Virginia counties. Plaintiff's customer registrations blanket the assigned territory, including a substantial and long-cultivated concentration of customers in and around Martinsburg. (Ex. E.)

**B. AHM's Performance Construct: A Washington, D.C. Yardstick for an Appalachian Market**

12. AHM grades Plaintiff through periodic “Dealer Sales Performance Summary” reports — in substance, a report card from the manufacturer. (Ex. F.) The reports designate Plaintiff's “DMA” (Designated Market Area) as WASHINGTON, DC. They count competitive-segment registrations within Plaintiff's ASA (6,030 for the period ending November 30, 2025), apply the average penetration of Honda dealers in Maryland and in the Washington, D.C. DMA, and declare the result — 1,086 units — to be Plaintiff's “expected” sales. Plaintiff's actual sales were 822. The 264-unit difference is expressed as a “Retail Sales Effectiveness” score of −24.31%. AHM's own footnote describes this construct as “the minimum sales necessary for Dealer to comply with its sales performance obligations under its Dealer Agreement.” The January–May 2026 report repeats the exercise: −28.38%.

13. The construct adjusts for nothing the law requires. It ignores the demographics, consumer vehicle preferences, terrain, natural boundaries, road conditions, and shopping patterns of Plaintiff's Appalachian-corridor market — statutory factors every one, Md. Code Ann., Transp. § 15-207(e)(3) — and simply assumes that customers in Berkeley County, West Virginia buy

vehicles the way customers in the Washington suburbs do. AHM knows the assumption is false: its own District Sales Manager, Christopher Fanzo, wrote to Plaintiff on February 9, 2026, in the course of refusing to take back an electric vehicle Plaintiff had not ordered, “I know they are slow movers, and your area does not have the demand of other areas.” (Ex. G.)

**C. AHM Starves the Dealership of Inventory While Enforcing the Metric**

14. A dealer's vehicle allocation and inventory is its very life-blood: a dealer cannot sell vehicles it is never shipped, and every downstream measure of the franchise — sales, service, parts, profitability, and AHM's own scoring — flows from supply. Throughout 2025 and 2026, AHM restricted Plaintiff's supply while enforcing objectives computed as though supply were unconstrained.

15. The contemporaneous record documents the starvation in the participants' own words. Fall 2025, Jacob Ritchie to AHM: inventory “rarely” sufficed to meet monthly objectives; “[o]ur sale rate, turn rate, cars on hand ... never match up with our allocation, objectives, or our expected sales”; “We are turning cars. Any word on the discretionary? We need help!” (Ex. G.) March 9, 2026, after AHM tendered seven discretionary units: “I was ok with 7 discretionary cars thinking we would get 100 on our allocation. There is no way we can consistently hit objectives if we don't get the cars.” (Id.) April 2, 2026, to AHM's Zone Manager: “We finished #1 in turn and still sitting at #1 for objective YTD ... We need cars!” (Ex. H.)

16. AHM's zone management confirmed both the scarcity and the criteria used to ration it. Zone Manager Jason Bradley wrote on April 2, 2026 that “our discretionary pool has been limited,” and on April 24, 2026 that discretionary vehicles are steered to dealers based on their scores in AHM's ancillary programs — certified pre-owned volume, customer-survey indices, and Honda Link enrollments — rather than on market demand: “If we have 30 cars to provide, we are

going to reconsider sending 30 cars to a dealer with an 80 HSE score considering we can send the 30 vehicles to a dealer with a 99 HSE score." (Ex. H.) And when Plaintiff asked AHM to hold back a single unwanted Prologue, Mr. Fanzo's answer was: "I cannot remove the Prologue." (Ex. G.) Coercing a dealer to accept vehicles it did not voluntarily order violates Md. Code Ann., Transp. § 15-207(c). The starvation continues to the eve of this filing. On July 30, 2026 — two weeks after the Martinsburg announcement — Jacob Ritchie wrote to Mr. Fanzo that the dealership's available days' supply was 14 days below the district, 15 days below the region, and 17 days below the national average: "This lack of inventory on the lot and coming in makes it impossible to compete and cover our market. Please help." Mr. Fanzo's same-day reply conceded that the dealership "is in need of additional vehicles" and "currently has the 6th lowest on-ground days' supply in the Zone" — and then admitted, in writing, the very conditioning this Complaint challenges: "discretionary allocation decisions will continue to align with Zone priorities and overall business performance, including new vehicle sales, Certified and True Used sales, RSE, HSE, and HondaLink enrollment results." (Ex. M.) AHM thus concedes that the RSE score it computes from an unfair yardstick is itself a criterion for the allocation that determines whether Plaintiff can ever improve that score — a closed loop of AHM's own construction, admitted two weeks after AHM announced the Point.

**D. Plaintiff's Actual Performance**

17. By AHM's own comparative documents, Plaintiff is an exceedingly well-run dealership in a difficult market. AHM's District 7E Year-End 2025 report shows Plaintiff grew retail sales 6.42% year-over-year (912 versus 857 units) — fourth-best among the district's sixteen dealers — while the district declined 2.6%. (Ex. I.) AHM's own retention scorecard shows Plaintiff's dealer retention (41.8%) above the national (39.8%), zone (40.8%), and district (36.5%)

averages, and its purchase retention (36.9%) above all comparators. (Ex. J.) AHM's fixed-operations report shows Plaintiff above the district on every customer-satisfaction index AHM tracks, with fixed-overhead coverage of 84.7% against AHM's 75% guide. (Ex. K.) AHM's own January 2026 review conceded Plaintiff's retention metrics were “solid at 40%, finishing 21 units above the District average.” (Ex. G.)

18. AHM's obstruction extends to the family's succession itself. In December 2024, Wilson, Inc. implemented a family succession plan under which H. Paul Ritchie retains voting control and trusts for the benefit of his sons Jacob and Britton hold more than 91% of the company's stock. On December 26, 2024, H. Paul Ritchie emailed the restructuring letter and its supporting documentation to AHM's Assistant Zone Manager for Market Representation — changes he had discussed with that manager in person. The same restructuring was submitted to the family's other franchisor, Kia, which approved it and executed a conforming amendment to its dealer agreement. Maryland law gave AHM 20 days to deliver the forms and information requests it considered necessary, and 75 days after receipt of the completed application to consent or state specific written grounds for refusal. Md. Code Ann., Transp. § 15-211(e)(3)–(4). AHM's only response came nearly three months later, on March 18, 2025, when the same manager asked for an attorney letter and rescanned copies of the documents already identified — 'to start the package.' Dealer counsel provided the requested attorney letter on March 31, 2025, completing the submission. The 75-day period of § 15-211(e)(4) accordingly expired in mid-June 2025. In the more than sixteen months since the completed submission — and the fourteen months since the statutory deadline lapsed — AHM has never approved the restructuring, never refused it, and never stated a single ground for withholding approval — while, on information and belief, planning the appointment of a competitor into the family's market. (Ex. N.)

**E. The Staged Announcement, the Broken Promise of a Response, and CMA's Head Start**

19. AHM's July 15, 2026 letter (Ex. C) is three sentences long. It identifies no criteria, no data, no study, no analysis of the market or of the effect on Plaintiff, and no avenue of review. It was delivered by Federal Express on July 15 — the same day it is dated — meaning AHM prepared and tendered it for shipment before the date it bears. The announcement, and its six-week fuse, were staged in advance.

20. Plaintiff protested immediately. On the morning of July 15, Plaintiff's President emailed AHM's Northeast Region Director, Paul Bearden, protesting that this market "has been assigned to Hagerstown Honda for over 35 years" and requesting a call that morning. (Ex. D.) No call and no reply ever came. By letter transmitted July 17, 2026 (Ex. D), Plaintiff's counsel invoked Section 22, requested the criteria on which AHM awarded the Point to a competitor, and requested a standstill commitment by July 21 and the supporting materials by July 23. AHM's only reply was to state that counsel's message would be returned. It never was, and AHM allowed both deadlines to lapse without any response. AHM finally responded on August 11, 2026 — twenty-seven days after the announcement and three weeks after counsel's deadlines — through outside litigation counsel. The letter refuses to produce any of the requested materials, yet asserts for the first time that AHM "did in fact perform an evaluation of this market," recites five factors said to support the appointment, and concedes that the Point sits "approximately 19.6 air miles" from Plaintiff's dealership — inside the adjoining state's 20-air-mile relevant market area by AHM's own measurement. Among the five factors is the assertion that "the Honda brand is materially underperforming in the Martinsburg market" — that is, in territory AHM assigned to Plaintiff, measured by the very construct, and constrained by the very allocation practices, that this Complaint challenges. (Ex. O.)

21. The appointee is not waiting. On information and belief, the Point is a conversion of CMA's existing Martinsburg Chrysler-Dodge-Jeep-Ram store. CMA's Chief Executive Officer, Liza Myers Borches — a former AHM field representative who previously served as the Honda representative for Plaintiff's own market and who maintains longstanding relationships with current AHM management — has publicly announced the coming Honda stores on her LinkedIn page, and CMA service employees are telling customers that the store is becoming a Honda dealership. (Ex. L.) AHM never considered Plaintiff for whatever additional representation it believed the market required; it selected an insider, concealed its reasons, excused its appointee from the requirements it imposes on everyone else, and started the clock. CMA is not adding a Honda franchise alongside its existing business: it is closing the Chrysler-Dodge-Jeep-Ram dealership outright — abandoning that manufacturer's franchise and its customers — to hand the facility to AHM's new point. And on information and belief, AHM is bypassing its own mandatory facility and brand-imaging process — the AHM-approved design, branding, and construction program required of every other new Honda dealership, which ordinarily takes many months or longer and costs millions of dollars — in order to fast-track a September 1 opening.

22. Unless restrained, AHM will authorize, supply, activate, and fully announce the Point on or about September 1, 2026 — while CMA's public marketing is already underway — creating irreversible market conditions before this Court, or the Maryland Motor Vehicle Administration under Transp. § 15-214, can adjudicate the lawfulness of AHM's conduct.

**COUNT I**
**(DECLARATORY JUDGMENT (28 U.S.C. §§ 2201–2202) (all Defendants)**

23. Plaintiff realleges paragraphs 1–22.

24. An actual and justiciable controversy exists between Plaintiffs and Defendants over whether AHM has complied with the Dealer Agreement and applicable law in assigning the Point to CMA.

25. Plaintiff is entitled to a declaration that: (a) Section 17.8 of the Dealer Agreement conditions any appointment into or affecting Plaintiff's ASA on the actual development and application of reasonable criteria; (b) AHM has not employed, disclosed, or applied reasonable criteria; (c) AHM's conduct violates Sections 17.8 and 22 of the Dealer Agreement and Md. Code Ann., Transp. §§ 15-206.1, 15-207, and 15-208; and (d) AHM may not implement the appointment, modify Plaintiff's ASA or assigned market area, or apply any performance standard, allocation methodology, or incentive program adversely affected by the appointment, unless and until it demonstrates compliance with the Dealer Agreement and applicable law.

**COUNT II**
**(BREACH OF CONTRACT: SECTION 17.8) (AHM)**

26. Plaintiff realleges paragraphs 1–25.

27. Section 17.8 of the Dealer Agreement reserves AHM's appointment right “based upon reasonable criteria” — a condition AHM drafted and repeated verbatim in its own ASA Notice. (Ex. A.)

28. AHM breached that condition by appointing the Point without developing, applying, or disclosing any criteria at all; on the strength of a performance construct its own field personnel disclaim in writing; in favor of an appointee led by a former AHM insider; without ever considering the incumbent dealer; and while dispensing, on information and belief, with the facility-imaging requirements AHM applies to every other new dealership — a standard reserved, apparently, for its favored appointee alone. AHM's construction of Section 17.8 — an

unreviewable power to appoint on no criteria, disclosed to no one — would read its own words out of the contract, and no rule of construction in any state permits that result.

29. Plaintiff has been and will be damaged, including through lost sales, service, and parts profits, diminished allocation and incentive opportunities, and the diminution of franchise and enterprise value built over 35 years, and faces irreparable harm for which no adequate remedy at law exists.

**COUNT III**
**(BREACH OF CONTRACT: SECTION 22) (AHM)**

30. Plaintiff realleges paragraphs 1–29.

31. AHM drafted Section 22 of the Dealer Agreement and promised in it to make every good-faith effort to resolve disputes fairly, promptly, and with minimal disruption to Plaintiff's business.

32. Plaintiff invoked the provision in writing two days after the announcement.

33. AHM's response was a promise to respond that went unkept for weeks, atop an immovable opening date of its own unilateral selection; when a response finally came, on August 11, 2026, it was from outside litigation counsel and refused the requested materials outright. (Ex. O.)

34. AHM breached Section 22 of the Dealer Agreement.

35. The emergency now confronting the parties exists only because AHM refused to follow the dispute-resolution procedure it wrote, and AHM may not rely on urgency created by its own breach. The natural remedy is preservation of the subject of the dispute until the promised process, or judicial adjudication, can occur. As a direct and proximate result of the conduct alleged, Plaintiff has suffered and will continue to suffer damages — including lost vehicle sales and the associated finance and insurance income; lost service, parts, and warranty revenue; lost incentive

payments; and injury to the goodwill and franchise value built over 35 years — in an amount to be proven at trial and well in excess of $75,000, exclusive of interest and costs.

**COUNT IV**
**(BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING) (AHM)**

36. Plaintiff realleges paragraphs 1–35.

37. Under Maryland law — or, alternatively, under the California law recited in Section 23.8 of AHM's form contract — every contract carries an implied covenant of good faith and fair dealing, and a party vested with discretionary power affecting the other's rights must exercise that discretion in good faith.

38. AHM exercised its discretion under Section 17.8 of the Dealer Agreement in bad faith: it restricted Plaintiff's inventory; measured Plaintiff against averages its own personnel concede do not fit this market; concealed every criterion; refused all process; and installed a competitor, led by a former AHM insider, at the edge of or within the territory on which every measure of Plaintiff's franchise performance depends — depriving Plaintiff of the benefits of its agreement while leaving every obligation in place. As a direct and proximate result of the conduct alleged, Plaintiff has suffered and will continue to suffer damages — including lost vehicle sales and the associated finance and insurance income; lost service, parts, and warranty revenue; lost incentive payments; and injury to the goodwill and franchise value built over 35 years — in an amount to be proven at trial and well in excess of $75,000, exclusive of interest and costs.

**COUNT V**
**(VIOLATION OF MD. CODE ANN., TRANSP. § 15-206.1, VIA § 15-213) (AHM)**

39. Plaintiff realleges paragraphs 1–38.

40. Section 15-206.1 requires of AHM "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade" in all conduct under the franchise. *Id.* § 15-206.1(a)

41. AHM's documented course of conduct fails both components: objectively, AHM abandoned the trade's settled practice of documented market study, impact analysis, and dealer consultation before a network addition — an apparatus AHM itself maintains through Urban Science — and subjectively, AHM starved its dealer, measured the resulting gap with a yardstick it knew was wrong, staged a pre-dated three-sentence announcement, selected an insider, waived for that insider the facility-imaging process it imposes on every other new point, promised a response it never gave, answered the family succession submission that Kia promptly approved and implemented with months of silence, a single belated request — satisfied by dealer counsel within two weeks — and sixteen further months of silence, and ran the clock.

42. Plaintiff is entitled to damages and reasonable attorneys' fees under § 15-213 and to declaratory and equitable relief.

**COUNT VI**
**(VIOLATIONS OF MD. CODE ANN., TRANSP. § 15-207) (AHM)**

43. Plaintiff realleges paragraphs 1–42.

44. Section 15-207(e), which applies "notwithstanding the terms of any franchise agreement," *id.* § 15-207(e)(1), requires that Plaintiff's assigned market area and every performance standard, sales objective, or program materially affecting Plaintiff — and their application — be fair, reasonable, and equitable; be based on accurate information; and include consideration of the demographic characteristics and consumer preferences of Plaintiff's assigned market, including car and truck preferences and geographic characteristics such as natural boundaries, road conditions, and terrain. *Id.* § 15-207(e)(3)(i).

45. AHM bears the burden of proving compliance. *Id.* § 15-207(e)(3)(iii).

46. The RSE construct and the ASA assignment, as designed and as applied — including their application to justify the Point while AHM restricted the inventory on which the metric depends — violate each of these requirements.

47. AHM's conduct further violates § 15-207(c), which forbids coercing a dealer to accept vehicles "not ordered voluntarily" (the forced Prologue placements), and § 15-207(j), which forbids discrimination among dealers in programs providing assistance, "including Internet listings, sales leads, warranty policy adjustments, marketing programs, and dealer recognition programs" — discrimination that AHM's conditioning of discretionary supply on ancillary-program scores, and its planned re-routing of listings and leads to the Point, effects and will effect.

48. To the extent AHM's standards rest on survey data, AHM has also failed to establish or disclose the survey methodology § 15-207(e)(4) requires.

49. Plaintiff is entitled to damages and attorneys' fees under § 15-213 and to declaratory and injunctive relief.

**COUNT VII**
**(VIOLATION OF MD. CODE ANN., TRANSP. § 15-208(e)–(f))**
**(UNFAIR ALLOCATION SYSTEM) (AHM)**

50. Plaintiff realleges paragraphs 1–49.

51. Section 15-208(f) requires that any new-vehicle allocation system operated by AHM "be reasonable and fair for all dealers"; obligates AHM to disclose its allocation method on a dealer's written request; and places on AHM the burden of proving compliance in any dispute.

52. Section 15-208(e)(2) guarantees Plaintiff the same right to incentive payments afforded all other same-line dealers. AHM's allocation system as applied to Plaintiff — chronic under-allocation against AHM's own objectives; an admittedly "limited" discretionary pool;

supply rationed by ancillary-program scores rather than demand; forced placement of unwanted units; and AHM's written concession of July 30, 2026 that discretionary allocation is steered by "RSE, HSE, and HondaLink enrollment results" even as Plaintiff sits at the 6th-lowest days' supply in the entire Zone (Ex. M) — is neither reasonable nor fair, and AHM cannot carry its burden of proving otherwise.

53. Plaintiff has demanded, and by this Complaint again demands in writing, disclosure of AHM's allocation methodology pursuant to § 15-208(f)(2).

54. AHM's violations have damaged Plaintiff and manufactured the very performance deficit AHM now invokes to justify the Point.

**COUNT VIII**
**(VIOLATION OF MD. CODE ANN., TRANSP. § 15-211 — OBSTRUCTION OF FAMILY SUCCESSION) (AHM)**

55. Plaintiff realleges paragraphs 1–54.

56. Section 15-211 protects a dealer's right to transfer ownership interests in its dealership.

57. On written notice of a proposed transfer, the manufacturer has 20 days to provide all forms and information requests it considers necessary, and 75 days after receiving the completed submission to consent or to provide a written statement of the specific grounds for its refusal. Md. Code Ann., Transp. § 15-211(e)(3)–(4).

58. Preventing or refusing to approve an ownership transfer or a change in executive management without a statement of specific grounds is itself a violation. *Id.* § 15-211(k).

59. Wilson, Inc. submitted its family succession restructuring to AHM by email on December 26, 2024. AHM's only response — a request for an attorney letter and rescanned copies of documents already identified — came on March 18, 2025, nearly three months later and well

outside the 20-day window of § 15-211(e)(3). Dealer counsel provided the requested attorney letter on March 31, 2025, completing the submission; the 75-day period of § 15-211(e)(4) expired in mid-June 2025. In the more than sixteen months since the completed submission, AHM has neither consented nor stated a single ground for refusal — while Kia, presented with the same restructuring, approved it and executed a conforming amendment to its dealer agreement.

60. AHM's inaction violates § 15-211 and corroborates the absence of good faith that pervades its conduct toward Plaintiff. Plaintiff is entitled to a declaration that AHM has violated § 15-211 and that AHM may not rely on, or take any action premised on, the unapproved status of the family succession; to damages in the categories previously alleged, including the injury to the family's succession planning; and to attorneys' fees under §§ 15-211(k) and 15-213.

**COUNT IX**
**(INTERIM AND PERMANENT INJUNCTIVE RELIEF) (all Defendants)**

61. Plaintiff realleges paragraphs 1–60.

62. Plaintiff is likely to succeed on the merits of the foregoing counts, two of which place the ultimate burden of proof on AHM.

63. Absent interim relief Plaintiff will suffer irreparable harm before final adjudication: the permanent migration of customers cultivated over 35 years; the destruction of goodwill; the mechanical degradation of every ASA-keyed metric governing Plaintiff's allocation, incentives, and leads, compounding through AHM's own algorithms in ways no damages calculation can reconstruct; and the practical impossibility of unwinding an opened, stocked, and staffed dealership.

64. The balance of equities tips decisively in Plaintiff's favor — AHM loses only time on a schedule it staged, and CMA's haste in marketing a contested point with full knowledge of this dispute merits no protection — and the injunction vindicates the public policy of Maryland's

dealer statutes and preserves the § 15-214 administrative forum from being rendered illusory. Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

(A) enter a temporary restraining order and preliminary injunction, and thereafter a permanent injunction, restraining AHM and all persons in active concert with it, including the Doe Dealership, from (i) authorizing the Point to commence dealership operations; (ii) supplying or allocating vehicles, parts, leads, advertising, or other support to the Point; (iii) activating the Point in any AHM system; (iv) announcing, advertising, or otherwise publicly marketing the Point; (v) modifying Plaintiff's ASA or assigned market area; (vi) modifying or adversely applying any allocation, performance, incentive, lead, marketing, or warranty standard or program affecting Plaintiff; and (vii) taking any action prejudicing Plaintiff's ability to obtain effective relief;

(B) enter declaratory judgments as set forth in Counts I and VIII;

(C) award compensatory damages in an amount to be proven at trial;

(D) award attorneys' fees and costs under Md. Code Ann., Transp. § 15-213;

(E) award pre- and post-judgment interest; and

(F) grant such further relief as is just.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 17, 2026

Respectfully submitted,

*/s/ Ezra S. Gollogly*
Ezra S. Gollogly (Bar No. 28088)

Kramon & Graham, P.A.
750 East Pratt Street
Suite 1100
Baltimore, Maryland 21202
egollogly@kg-law.com
(410) 752-6030 (Telephone)
(410) 361-8233 (Facsimile)

Bruce E. Baldinger (*pro hac vice* forthcoming)
Lorraine Medeiros (*pro hac vice* forthcoming)
THE LAW OFFICES OF BRUCE E. BALDINGER, LLC
365 South Street, Morristown, NJ 07960
bbaldinger@baldingerlaw.com
lorraine@baldingerlaw.com
(908) 218-0060 (Telephone)

*Attorneys for Plaintiff Wilson, Inc. d/b/a Hagerstown Honda*

Docusign Envelope ID: 8880AE8F-F9C9-86F2-8202-B06632F603B3


**VERIFICATION (28 U.S.C. § 1746)**

I, Jacob Paul Ritchie, Vice President and Treasurer of Wilson, Inc. d/b/a Hagerstown Honda, declare under penalty of perjury that the factual statements in the foregoing Verified Complaint are true and correct to the best of my knowledge, information, and belief.

Executed on August 14, 2026

Signed by:
9500E0BFBE40414...

Jacob Paul Ritchie

## EXHIBIT LIST

**Exhibit A —** Dealer Agreement (Jan. 1, 2025) with Term Attachment

**Exhibit B —** Notice of Dealer ASA (Aug. 22, 2022), maps and structure lists

**Exhibit C —** AHM letter of July 15, 2026 (Bearden), with FedEx envelope and tracking data

**Exhibit D —** Demand letter of July 17, 2026, with transmission/delivery proof; H.P. Ritchie July 15 email to Bearden

**Exhibit E —** Customer-registration map and Google Earth distance/terrain exhibits

**Exhibit F —** Dealer Sales Performance Summaries (CYTD 11/30/2025; CYTD 5/31/2026)

**Exhibit G —** Fanzo (District Sales Manager) correspondence re discretionary allocation

**Exhibit H —** Bradley (Zone Manager) correspondence re allocation (Apr. 2026)

**Exhibit I —** District 7E Year-End 2025 Performance Report (excerpts)

**Exhibit J —** Loyalty/Retention Scorecard (Jun. 2025–May 2026)

**Exhibit K —** Fixed Operations Performance Report (May 2026)

**Exhibit L —** Captures of CMA public announcements (Borches LinkedIn; CMA's CDJR Facebook)

**Exhibit M —** Email exchange of July 30, 2026 between J. Ritchie and C. Fanzo (days'-supply and allocation-criteria admissions)

**Exhibit N —** Family succession submission to AHM (c. Mar. 2025); Kia approval of the same restructuring; related correspondence

**Exhibit O —** Letter of AHM's counsel (S. McKelvey, Nelson Mullins) dated August 11, 2026

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th day of August, 2026 copies of the foregoing document were sent by email and first-class mail to:

Steven A. McKelvey, Jr.
Nelson Mullins Riley & Scarborough LLP
1320 Main Street, 17th Floor
Columbia, South Carolina 29201
803-799-2000 (phone)
steve.mckelvey@nelsonmullins.com

*Attorneys for Defendant American Honda Co., Inc.*

Paul Bearden
Northeast Region Director
American Honda Motor Co., Inc.
1919 Torrance Blvd
Torrance, California 90501
paul_bearden@na.honda.com

I HEREBY CERTIFY that on this 17th day of August, 2026 copies of the foregoing document were sent by Federal Express to:

CMA's Honda of Martinsburg
Attn: Liza Myers Borches
48 Kelly Island Road
Martinsburg, West Virginia 25401

*/s/ Ezra S. Gollogly*
Ezra S. Gollogly