**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| WILSON, INC. d/b/a HAGERSTOWN HONDA | * | |
| Plaintiffs | * | |
| v. | * | Civil Action No. 1:26-cv-03238 |
| AMERICAN HONDA MOTOR CO., INC., et al. | * | |
| Defendants | * | |

*   *   *   *   *   *   *   *   *   *   *   *   *

**DEFENDANT AMERICAN HONDA MOTOR CO., INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND FACTS ................................................................................................ 3

LEGAL STANDARD .................................................................................................... 6

LEGAL ANALYSIS ...................................................................................................... 7

I. Plaintiff has no Likelihood of Success on the Merits of its Claims ................................ 10

A. Plaintiff's Breach of Contract Claims are Unlikely to Succeed.................................11

B. Plaintiff's Claims under the Maryland Transportation Article Cannot Support the Injunctive Relief Sought Here. ................................................. 13

1. The Maryland Transportation Article Cannot Apply Extraterritorially to the Establishment of a New Dealership Across State Lines in West Virginia. ........... 13

2. Plaintiff's Allegations under Section 15-207(e) are Unlikely to Succeed and Provide no Basis to Enjoin the Proposed New Dealership. ........................... 15

3. Plaintiff's Allegations under Section 15-206.1 are Unlikely to Succeed and Provide no Basis to Enjoin the Proposed New Dealership. ........................... 17

II. Plaintiff Cannot Establish a Likelihood of Irreparable Harm. ......................................... 18

III. The Balance of Equities Favors Defendants. ................................................................. 22

IV. The Public Interest and Public Policy Favor Denial of a Preliminary Injunction. ........... 24

CONCLUSION ............................................................................................................. 26

## TABLE OF AUTHORITIES

Page(s)

Cases

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
172 F.4th 361 (4th Cir. 2026) .......... 19, 20

*Antwerpen Dodge, Ltd. v. Herb Gordon Auto World, Inc.*,
117 Md. App. 290, 699 A.2d 1209 (1997) .......... Passim

*Ass'n for Accessible Medicines v. Frosh*,
887 F.3d 664 (4th Cir. 2018) .......... 14

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012) .......... 18

*Central GMC, Inc. v. General Motors Corp.*,
946 F.2d 327 (4th Cir. 1991) .......... 25

*Chairman of Bd. of Trs. of Emps.' Ret. Sys. v. Waldron*,
285 Md. 175, 401 A.2d 172 (1979) .......... 14

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) .......... 18

*DMF Leasing, Inc. v. Budget Rent-A-Car of Maryland, Inc.*,
161 Md. App. 640, 871 A.2d 639 (2005) .......... 19

*Fitzgerald's Lakeforest Motors, Inc. V v. Toyota Motor Sales USA, Inc.*,
No. CV CCB-19-2261, 2021 WL 4339204 (D. Md. Sept. 23, 2021) .......... 9

*Goldstein v. Miller*,
488 F. Supp. 156 (D. Md. 1980) .......... 19

*Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*,
264 F. Supp. 2d 282 (D. Md. 2003) .......... Passim

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*,
17 F.3d 691 (4th Cir. 1994) .......... 7

*Kim v. Cedar Realty Tr., Inc.*,
116 F.4th 252 (4th Cir. 2024) .......... 13

*Leep HYU, LLC v. Hyundai Motors Am.*,
No. 3-11-CV-81-CRW-RAW, 2011 WL 13401798 (S.D. Iowa Dec. 30, 2011) .......... 14

*Lonza Walkersville, Inc. v. Adva Biotechnology Ltd.*,
581 F. Supp. 3d 736 (D. Md. 2022) .......... 18

*Mount Vernon Props., LLC v. Branch Banking And Tr. Co.*,
170 Md. App. 457, 907 A.2d 373 (2006) .......... 13

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
915 F.3d 197 (4th Cir. 2019) .......... 18

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*,
905 F. Supp. 2d 675 (D. Md. 2012) .......... 9

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) .......... 7

*Poudel v. Mid Atlantic Professionals, Inc.*,
115 F.4th 287 (4th Cir. 2024) .......... 14

*Real Truth About Obama, Inc. v. FEC*,
575 F.3d 342 (4th Cir. 2009) .......... 7

*Rhode Island Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*,
180 F.4th 365 (1st Cir. 2026) .......... 14

*Sampson v. Murray*,
415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) .......... 7, 18, 20

*Scotts Co. v. United Indus. Corp.*,
315 F.3d 264 (4th Cir. 2002) .......... 24

*Semmes Motors, Inc. v. Ford Motor Co.*,
429 F.2d 1197 (2d Cir. 1970) .......... 19

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... Passim

<u>Statutes</u>

Md. Code Ann., Transp. § 15-206.1 .......... 9, 10, 17

Md. Code Ann., Transp. § 15-207 .......... 8, 9, 16, 17

Md. Code Ann., Transp. § 15-211 .......... 17

W. Va. Code §§ 17A-6A-12; 17A-6A-3(11) .......... 11, 15

## INTRODUCTION

This motion is an attempt by an existing Honda dealer in Maryland to enjoin a West Virginia entity from opening a new Honda dealership that is 19.6 miles away from the plaintiff and across state lines in West Virginia, jeopardizing the employment of dozens of West Virginia citizens and the public benefits associated with this new business, and in flagrant disregard for established authorities rejecting its theories, solely in an effort to protect itself from having to compete in the marketplace. Simply stated, there is no justification for this request, and it should be denied.

As set forth in detail below, American Honda takes the establishment of a new Honda dealership very seriously. American Honda follows a long-established and vigorous process for identifying markets that potentially require additional representation, works with industry experts to evaluate a wide range of consumer and competitive data, and identifies seasoned candidates for those dealership points that are experienced in the market and capable of providing high-quality sales, service, and other benefits to local consumers. Although Plaintiff's motion presupposes otherwise, American Honda adhered to that process here.

Similarly, despite Plaintiff's allegations to the contrary, the establishment of this new dealership in Martinsburg is not an admonition of Plaintiff's operations; in fact, Plaintiff's performance was not the basis for American Honda's decision to move forward with this new point at all. That decision instead reflects the undeniable fact that there is no Honda dealership within 19 miles of Martinsburg to serve the growing number of customers in that community, and that without representation, the Honda brand is materially underperforming in that market compared to its main competitors. It also reflects American Honda's reasonable business judgment, based on industry expert analysis, that an additional dealership in Martinsburg would improve access to

Honda brand vehicles and service (including warranty and recall service) for local consumers. For these reasons, Plaintiff's entire theory of the case can be swiftly debunked.

Although Plaintiff's filings cast a wide range of accusations and theories against American Honda, at the end of the day, there is only one issue for the Court to decide on this Motion: does Plaintiff have a viable legal basis to enjoin the establishment of a new Honda dealership across state lines in West Virginia. The answer is that it does not. Indeed, as outlined in detail below, Plaintiff's Motion suffers from multiple flaws that are fatal to its request for injunctive relief.

First, Maryland has enacted no "establishment" statute that gives existing dealers the right to challenge the opening of a new dealership, and the myriad claims raised by Plaintiff in an attempt to manufacture such a legal challenge all have been rejected by Maryland federal and state courts alike. Second, Plaintiff's motion seeks to use Maryland law to enjoin the establishment of a new dealership across state lines in West Virginia, which runs afoul of Maryland's presumption against extraterritorial application of its statutes and a recent First Circuit decision holding dealers cannot use state motor vehicle statutes to challenge proposed dealerships across state lines. Third, Plaintiff simply cannot meet its burden of establishing irreparable harm, and any alleged loss of business it incurs based on a new dealership opening in another state is fully compensable by money damages. Fourth, in stark contrast to Plaintiff, the granting of an injunction would prevent the proposed dealer at issue here from opening at all and cause it to lose all of its business. And all the while, the public in Martinsburg would be denied the significant benefits that come with the proposed dealership, including increased customer choice, improved customer convenience, stable employment, and easier access to essential services like vehicle sales and service.

Simply stated, none of these factors support enjoining the establishment of a new Honda dealership across state lines in West Virginia. Instead, this Court should apply the same reasoning

as the previous decisions that have addressed this very issue and reach the same result: that Plaintiff's request for a temporary restraining order and preliminary injunction must be denied.

## **BACKGROUND FACTS**

American Honda is a distributor of new Honda vehicles and related products, which it distributes across the country through a network of authorized dealers. (Compl., Dkt. No. 1 ¶ 6; Bearden Decl. ¶ 2). Plaintiff is an authorized Honda dealership in Hagerstown, Maryland, which is authorized to sell and service Honda vehicles pursuant to a Honda Dealer Sales and Service Agreement ("Dealer Agreement") between the parties. (Dkt. No. 1 ¶¶ 5, 9) (Bearden Decl. ¶ 3).

Because American Honda sells and services Honda vehicles to retail consumers through authorized dealers, American Honda has a strong and legitimate interest in ensuring that it maintains an authorized network of dealers in competitive numbers and locations as needed to serve the ever-changing demands of the consuming public. (Bearden Decl. ¶ 4). American Honda from time to time therefore conducts evaluations of various markets and the Honda representation therein to determine if additional representation is needed. (*Id.*). Pursuant to this process, in or around the middle of 2025, American Honda identified the Martinsburg, West Virginia, market as a potential area of growth and opportunity for additional representation. (*Id.* ¶ 5).

Contrary to Plaintiff's conjecture, this evaluation was not based in any way on any individual dealer's sales performance or retail sales effectiveness ("RSE"). (*Id.* ¶ 19). RSE is the industry-standard methodology for manufacturers to evaluate an individual dealer's performance of its new vehicle sales obligations under the Dealer Agreement, and it is used in some form for that purpose by virtually every manufacturer in the industry. (*Id.* ¶ 18). Instead, American Honda evaluates the potential need for additional representation in a market through a wide range of other factors and considerations, including, but not limited to, the Honda brand's overall performance in

the market (rather than the performance of any individual dealers), the demographic trends and population growth in the market, the presence of dealerships for competing brands, the impact on customer convenience for sales and service, and other similar factors. (*Id.* ¶ 19).

Although Plaintiff supposes otherwise, that is the exact process American Honda followed here. On or about August 25, 2025, American Honda—in conjunction with a leading market-analytics firm named Urban Science—commissioned a detailed market study to evaluate those very factors ("Market Study"). A true and accurate copy of the 77-page long Market Study is attached to the Bearden Declaration as **Exhibit A**. (*Id.* ¶ 6). The Market Study found as follows:

- The next closest Honda dealer to the southwest of Hagerstown Honda is located in Winchester, Virginia, which is 43.4 air miles and 50.0 drive miles southwest of Plaintiff—a significant gap in the market where Honda customers have no physical representation for vehicle sales, parts sales, or warranty/recall service. (Bearden Decl., Ex. A at 9-10).

- Martinsburg, which is in the middle of that significant gap, currently houses dealership locations for Toyota, Chevrolet, Ford, and Chrysler Jeep Dodge. (*Id*. at 5). All of these brands also have dealership locations in Hagerstown, Maryland, and have been able to operate in that competitive environment. (*Id*.).

- Martinsburg is a large and growing market. In 2025, its population was 208,615, which is larger than the Hagerstown market, and its population is expected to continue growing over the next several years at a pace exceeding the growth in surrounding areas, the local state averages, and the national average. (*Id*. at 12). These facts indicate that Martinsburg and the surrounding area can support a new dealership location and that customer demand for Honda sales and service in that market will continue to grow.

- There is a significant existing density of population, households, and new vehicle registrations in and around Martinsburg, further confirming the opportunity for motor vehicle sales and service in that market. (*Id*. at 48, 51, 65).

- As expected, Toyota—which has a dealer in Martinsburg—is dominating that market. As of year-end 2024, the Toyota brand made 646 sales in Hagerstown compared to 630 Honda sales in that market. During that same time frame, however, the Toyota brand made 1,145 sales in Martinsburg compared to only 639 sales by Honda. (*Id*. at 13).

- American Honda evaluated the Honda brand's performance in Martinsburg under multiple standards, and as expected, the brand is performing significantly lower in Martinsburg (where it has no dealer) than in other markets. (*Id*. at 18, 23, 28, 33, 38).

- As the statistics above suggest, the Martinsburg market is an area where there is currently a high industry volume of new vehicle sales but low brand penetration for the Honda brand, which suggests a need for additional representation in this market. (*Id*. at 57).

- The potential site for a new dealership would be 19.6 air miles and 24.2 drive miles away from Plaintiff, which is a significant distance between dealerships of the same brand. (*Id*. at 9-10; Bearden Decl. ¶ 7(h)).

Given these and the other findings set forth in Market Study, American Honda reasonably exercised its business judgment to move forward with the addition of a new dealership in Martinsburg to better serve the consuming public in that community. (Bearden Decl. ¶ 9).

American Honda also chose to appoint Liza Borches and Carter Myers Automotive (collectively referred to as "CMA") as the proposed operator. Excerpts from American Honda's candidate selection presentation are attached to the Bearden Declaration as **Exhibit B**. (*Id*. ¶ 11).[1] CMA was the natural choice. CMA is led by Ms. Borches, a fourth-generation dealer who became Chief Executive Officer approximately 15 years ago. (Bearden Decl., Ex. B at 9; 11). CMA is an extremely experienced dealership group that currently operates approximately 26 locations throughout the mid-Atlantic, including three different brand locations in Winchester, Virginia, and three different brand locations in Martinsburg, West Virginia—the very market at issue here. (*Id.* at 9; 13). CMA also offered a unique opportunity—an existing Chrysler Dodge Jeep Ram facility in Martinsburg that it was willing to renovate and convert to a Honda facility in order to allow the brand to serve customers in this market more quickly. (Bearden Decl. ¶ 13). Indeed, American Honda's understanding is that CMA has relinquished its Chrysler Jeep Dodge Ram franchises in Martinsburg as part of its transition to the Honda brand. (*Id*.).

[1] The complete Candidate Selection Presentation contains a significant amount of confidential financial, operational, and other business information that is not relevant to the present Motion. Accordingly, American Honda is attaching select excerpts from that presentation for purposes of responding to this Motion only.

Although American Honda was under no obligation to do so, on July 15, 2026, American Honda sent a courtesy letter to Plaintiff stating that American Honda plans to establish CMA as a new Honda dealership in Martinsburg, West Virginia, and that the dealership would become operational as of September 1, 2026. (Dkt. 1-4). In response, Plaintiff purportedly sent Paul Bearden, the Northeast Region Director for American Honda, an email that day requesting a phone call, but never received a response. (Dkt. 1-5 at 7). This email, however, suffered from a small but significant scrivener's error: Plaintiff misspelled Mr. Bearden's last name in his email address as "beardon," and the email was never received. (*Id.*; Bearden Decl. ¶ 16).

Accordingly, American Honda first learned of Plaintiff's position several days later when it received a lengthy demand letter from Plaintiff's outside counsel raising multiple legal theories, threatening litigation, and demanding that American Honda turn over 14 broad categories of documents (among other demands). (Dkt. 1-5 at 4-5). American Honda naturally acted in kind by engaging outside counsel to respond on its behalf. (Dkt. 1-16). Although that response clearly noted American Honda's disagreement with Plaintiff's position and refused to open its record books for all to see, American Honda expressly (1) informed Plaintiff that it had performed an evaluation of this market based on its standard processes, (2) identified several of the key factors evaluated when making this decision, and (3) offered to engage in good faith discussions. (*Id.*). Plaintiff's response was to file this action six days later seeking injunctive relief.

## **LEGAL STANDARD**

A temporary restraining order or preliminary injunction is an extraordinary remedy that may be granted only upon a clear showing that the movant is entitled to relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain such relief, a movant must establish four elements: (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm

in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Id*.

The movant bears the burden of making a clear showing as to each of these four factors, and a strong showing on one cannot excuse the failure to establish another. *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346-47 (4th Cir. 2009), *vacated*, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010), *reissued in relevant part*, 607 F.3d 355 (4th Cir. 2010). A mere possibility of success on the merits, or a mere possibility of irreparable harm, is insufficient to justify preliminary injunctive relief. *Winter*, 555 U.S. at 22. Because all four factors must be satisfied, a moving party's failure to carry its burden on any factor requires denial of the requested relief. *See id*. at 20-24; *Real Truth About Obama*, 575 F.2d at 346-47.

As to the first factor, the movant must make a clear showing that it is likely to succeed on the merits. *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013), abrogated on other grounds by *Stinnie v. Holcomb*, 37 F.4th 977 (4th Cir. 2022). As to irreparable harm, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693-94 (4th Cir. 1994) (quoting *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974)). Harm that can be remedied through an award of money damages therefore does not ordinarily constitute the irreparable injury necessary to justify preliminary relief. *See id*.

## <u>**LEGAL ANALYSIS**</u>

This Motion is not a matter of first impression. Prior to this action, several dealers in Maryland have filed similar motions in an attempt to enjoin the opening of a new dealership based on similar theories. Those attempts have been rejected by state and federal courts alike.

The seminal decision on this issue is *Antwerpen*, 117 Md. App. 290, 699 A.2d 1209, in which an existing Dodge dealer sought to enjoin the establishment of a new Dodge dealership in Clarksville, Maryland, under several of the same legal theories at issue here. As in this case, the plaintiff alleged that it had represented Dodge for many years, had made significant investments in its operations, and the new dealership would harm its business. *Id.* at 295-99, 699 A.2d at 1212-13. While the circuit court initially granted the injunction, the Court of Special Appeals overturned and vacated the injunction in full. Balancing the equities, the court held that while the plaintiff alleged that it "possibly will lose a portion of its business if the injunction is not in place," the new dealer would be prevented from conducting any business and "is certain to lose all of its business with the injunction in place." *Id.* at 307, 699 A.2d at 1217. Similarly on the issue of irreparable harm, the court held that the plaintiff could be compensated through money damages and found that the plaintiff dealer "has a sales history against which to measure damages in the event it loses business," but the proposed new dealer has no such history, "making it potentially very difficult, if not impossible" to assess its damages. *Id.*

The court also held that there was "little likelihood" of success on the merits. First, the court found that while most states have enacted "establishment" statutes that give existing dealers the right to challenge a proposed new dealership in certain circumstances, Maryland does not have such a provision, and the legislature has expressly chosen not to establish one. *Id.* at 312-14, 699 A.2d at 1220-21. Although the plaintiff attempted to manifest these same protections by asserting a claim under subsection (d) of Md. Code Ann., Transp. § 15-207—a general provision addressing coercion—the court declared that "Section 15-207 does none of these things" and "does not provide a basis for injunctive relief." *Id.* Similarly, the court rejected the dealer's breach of contract claims based on the "sales locality" and arbitration provisions in the dealer agreement.

Instead, the court found that the dealer agreement makes clear that the dealer's sales locality is not an exclusive territory, contains no provision requiring Dodge to notify dealers of a new dealership, and provides no specific criteria Dodge must apply when establishing a new dealer. *Id.* at 314-15, 699 A.2d at 1221. Finally, the court held that the arbitration clause does not confer any rights on the plaintiff related to a proposed dealership and "is not linked to any affirmative provision" regarding the establishment of new dealers, and thus could not support injunctive relief. *Id.*

These holdings were reaffirmed in *Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*, 264 F. Supp. 2d 282 (D. Md. 2003), which granted a motion dismiss similar claims brought by two Volkswagen dealers without leave to amend. The plaintiffs again were long-term dealers who claimed they had invested "substantial sums" and sought to enjoin the establishment of a new dealership in Baltimore under the very same legal theories at issue here. *Id.* at 285-86. Following the analysis in *Antwerpen*, the court rejected these claims. As in this case, the dealers first asserted a claim under Section 15-207(e), which prohibits a manufacturer from "requiring or coercing a dealer to adhere to performance standards that are not applied uniformly to other similarly situated dealers." The court, however, held this provision "is no more applicable to the claims asserted by plaintiffs in the present case than was § 15-207(d) in *Antwerpen*" because Volkswagen (1) did not apply dealer performance standards in making its decision to establish the new dealership and (2) "[m]ore importantly, was not required to apply such standards or show good cause" before establishing the new dealership. *Id.* at 287-88. [2]

[2] Plaintiff attempts to distinguish *Antwerpen* and *Heritage* by citing to two later opinions where claims under Section 15-206.1 survived dismissal, but those decisions could not be more irrelevant to this dispute. Indeed, neither of those actions even involve the establishment of a new dealership. The first decision, *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675 (D. Md. 2012), involved a manufacturer's refusal to approve a proposed buy-sell—a subject matter expressly governed by a separate provision of the Transportation Article. The second decision, *Fitzgerald's Lakeforest Motors, Inc. V v. Toyota Motor Sales USA, Inc.*, No. CV CCB-19-2261, 2021 WL 4339204 (D. Md. Sept. 23, 2021), involved a dispute over warranty payments—another issue that is expressly regulated by a separate provision in the Transportation Article. These decisions have no bearing here.

Just like here, the plaintiffs also brought a claim under Section 15-206.1, which requires good faith in acting under the "terms, provisions or conditions of any franchise agreement" or "in any transaction governed by [the Transportation Article]." *Id.* The court, however, held that *Antwerpen* also disposes of this claim because (1) the dealer agreement did not place any viable restrictions on the opening of new dealerships and (2) the establishment of new dealerships are not addressed by the Transportation Article and cannot be a "transaction or conduct governed by" its provisions. *Id.* Finally, the court dismissed the plaintiffs' claim that Volkswagen had breached the dealer agreement by failing to conduct quarterly reviews of their performance, which they alleged, if done, could have avoided the need for a new dealership. The court held that there was no causal connection between the alleged breach and the decision to open a new dealership, and that while it may be customary to discuss new points with existing dealers, "no state law requires such action and nothing in the contract specifically creates such an obligation." *Id.* at 288-89.

These precedents are binding and apply with equal force here. As discussed below, Plaintiff's claims against American Honda fail for these same reasons, and, in fact, are even more tenuous given that they seek to challenge a proposed dealership across state lines in West Virginia.

## I. <u>Plaintiff has no Likelihood of Success on the Merits of its Claims</u>

Plaintiff has little or no likelihood of success on its claims related to the proposed establishment of a new Honda dealership in West Virginia. First, there are no "establishment" statutes that apply here or require American Honda to (1) give Plaintiff notice of the proposed new dealership or (2) justify its decision to establish the new dealership. As recognized in *Antwerpen*, Maryland has expressly chosen not to enact such a provision. 312-14, 699 A.2d at 1220-21. Similarly, while West Virginia has enacted an establishment statute, that provision only provides notice and protest rights to an existing dealer "who has an established place of business in [West

Virginia] and is licensed by the [West Virginia] Division of Motor Vehicles." W. Va. Code §§ 17A-6A-12; 17A-6A-3(11). Plaintiff does not meet either of those conditions precedent and, recognizing as much, does not even attempt to assert a claim under those provisions. Without a direct path to challenge the new dealership here, Plaintiff instead follows the circuitous strategy employed by its predecessors in *Antwerpen* and *Heritage*—grasping for other statutes and contractual provisions in an attempt to manufacture that right. As recognized in those decisions, however, Plaintiff has little hope of success on any of these claims.

**A. Plaintiff's Breach of Contract Claims are Unlikely to Succeed.**

Plaintiff first claims that American Honda's decision to establish the new dealership in West Virginia constitutes a breach of several provisions of the Dealer Agreement. The first provision is Section 17.8, which governs the dealer's assigned ASA and states as follows:

> Dealer understands and agrees that, while it has responsibility for the promotion and retail sale and servicing of Honda Products within the Area of Statistical Analysis in which it is located, ***Dealer has no territorial exclusivity to, and no proprietary right in, the Area of Statistical Analysis***. Further, ***American Honda reserves the right, based upon reasonable criteria, to appoint or relocate other authorized Dealers of Honda Products into the Area of Statistical Analysis or any other location***. American Honda will, upon Dealer's written request, provide Dealer with a description of its then-current Area of Statistical Analysis.

(Dealer Agmt., Dkt. 1-2) (emphasis added). Plaintiff has no likelihood of success on this claim.

Just like the dealer agreement in *Antwerpen*, the contract provision above makes clear that Plaintiff has "no territorial exclusivity" to and "no proprietary right" in the ASA, and thus eliminates any right or expectation that Plaintiff has to be free from competition in its ASA. *Antwerpen*, 117 Md. App. at 314-15, 699 A.2d at 1221. Like the agreement in *Antwerpen*, this provision also contains no language requiring American Honda to notify Plaintiff of its decision to establish a new dealership and contains no specific criteria that American Honda must employ

when making that decision. *Id.* Instead, this clause expressly gives American Honda *the right* to appoint new dealers in its discretion *based upon reasonable criteria only*.

Even if this provision could be read as giving American Honda some obligation to Plaintiff rather than as a mere reservation of its own rights, there is no doubt that American Honda employed "reasonable criteria" when making its decision. In its brief, Plaintiff concedes that the "reasonable commercial standard" for manufacturers evaluating a new point is to prepare a "documented market study," often in conjunction with a leading market-analytics firm named Urban Science, that evaluates registration data, drive time, and other factors in the market. (Mem. Supp., Dkt. No. 6-1 at 12). Although Plaintiff speculates otherwise, this very type of market study was performed here. As set forth above, American Honda—along with Urban Science—prepared a 77-page Market Study that evaluated multiple data points related to this new dealership. This detailed evaluation more than satisfies the contractual language regarding "reasonable criteria."

Plaintiff's claim under Section 22 of the Dealer Agreement also provides no basis to enjoin the proposed dealership. Section 22 is a general dispute resolution clause that states as follows:

> Dealer and American Honda recognize that it is best to avoid disputes whenever possible, but when disputes do arise, it is desirable to resolve such disputes in a fair, prompt and cost-efficient manner. Therefore, Dealer and American Honda agree to make every good faith effort to resolve disputes between them arising under this Dealer Agreement or applicable law in such a manner so as to minimize the disruption of their respective businesses.

(Dkt. No. 1-2). American Honda disputes that it breached this provision,[3] and, as importantly, this provision provides no basis to enjoin the proposed dealership. Much like the arbitration and other

---

[3] Plaintiff has pled no breach of this provision. Although Plaintiff tried to send Mr. Bearden an email asking to discuss the proposed dealership, Plaintiff misspelled Mr. Bearden's email address. (Demand Letter, Compl. Ex. D, Dkt. No. 1-5) (Bearden Decl. ¶ 16). The first time American Honda learned of Plaintiff's concerns was when it received a demand letter from Plaintiff's outside counsel threatening litigation. (Dkt. No. 1-5) (Bearden Decl. ¶ 17). Although American Honda disagreed with the contents of this letter, in an effort to work with Plaintiff, it responded by outlining many of the criteria it considered when establishing the proposed dealership and indicated it was engaging in discussions in good faith. (Dkt. No. 1-16). This is no breach of contract.

provision raised in *Antwerpen*, the dispute resolution clause above does not confer any rights on Plaintiff related to open points, is "not linked to any affirmative provision" related to open points, and contains "no causal connection" with American Honda's decision to establish the new dealership. *Antwerpen*, 117 Md. App. at 314-15, 699 A.2d at 1221; *Heritage*, 264 F. Supp. 2d at 288-89. Accordingly, this provision simply does not support the relief Plaintiff seeks in this Motion: an injunction to prevent the new dealership from opening.[4]

**B. Plaintiff's Claims under the Maryland Transportation Article Cannot Support the Injunctive Relief Sought Here.**

Because there are no "establishment" statutes that provide Plaintiff any right to challenge the proposed new dealership, Plaintiff attempts to enjoin this new dealership from opening by relying on the very same statutes that the dealers relied on—and which were rejected—in *Antwerpen* and *Heritage*. None of these statutes, however, give Plaintiff the right to challenge the addition of this new dealership, much less enjoin that dealership from opening.

1. <u>The Maryland Transportation Article Cannot Apply Extraterritorially to the Establishment of a New Dealership Across State Lines in West Virginia</u>.

First, even if the Maryland statutes cited by Plaintiff could be used to challenge the establishment of a new dealership *in Maryland*, which they cannot, those statutes indisputably cannot be used to restrain commerce and the opening of a new dealership *in West Virginia*.

The Dormant Commerce Clause forbids the very application of Maryland law that Plaintiff seeks here. That doctrine "is driven by concern about economic protectionism" and forbids "regulatory measures designed to benefit in-state economic interests by burdening out-of-state

[4] Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails for the same reasons. Although Maryland law implies a duty of good faith that "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract," *Kim v. Cedar Realty Tr., Inc.*, 116 F.4th 252, 265-66 (4th Cir. 2024), no independent cause of action exists for such a breach. *Mount Vernon Props., LLC v. Branch Banking And Tr. Co.*, 170 Md. App. 457, 472, 907 A.2d 373, 382 (2006). In addition, the implied covenant "does not guarantee any new rights or obligations that do not already exist in the contract." *Kim*, 116 F.4th at 265-66.

competitors." *Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664, 667–68 (4th Cir. 2018). An incumbent dealer's effort to invoke its home-state statute to block a competitor from opening in another state squarely implicates that concern.

Indeed, the First Circuit just last month rejected a materially identical effort in *Rhode Island Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*, 180 F.4th 365, 377–80 (1st Cir. 2026), and held that a dealer in Rhode Island could not reply upon the motor vehicle statutes in that state to challenge the opening of a new dealership in Massachusetts because the proposed application of Rhode Island law would have directly regulated an out-of-state franchise transaction, restricted out-of-state competition, and risked inconsistent regulation by the two states. *See also Leep HYU, LLC v. Hyundai Motors Am.*, No. 3-11-CV-81-CRW-RAW, 2011 WL 13401798, at *4 (S.D. Iowa Dec. 30, 2011) (rejecting an Iowa dealer's effort to enjoin an Illinois dealership and explaining that "[o]nly Illinois authorities have the authority to decide what dealers may be located in Illinois").

Additionally, Maryland law does not even reach the out-of-state activity Plaintiff seeks to prohibit. As the Fourth Circuit recently reaffirmed, "'unless an intent to the contrary is expressly stated, acts of the [Maryland] legislature will be presumed not to have any extraterritorial effect.'" *Poudel v. Mid Atlantic Professionals, Inc.*, 115 F.4th 287, 291 (4th Cir. 2024) (quoting *Chairman of Bd. of Trs. of Emps.' Ret. Sys. v. Waldron*, 285 Md. 175, 401 A.2d 172, 177 (1979)). Indeed, *Poudel* applied that presumption even though the defendant was a Maryland company and the statutes at issue reflected a strong Maryland public policy. *Id*. at 291–93. Nothing in the provisions of the Transportation Article invoked by Plaintiff expressly extends the reach of those statutes to the establishment or operation of a dealership in another State.

These principles apply directly here. Plaintiff attempts to avoid the interstate implications of its requested relief by insisting that its claims regulate only American Honda's conduct toward

a Maryland dealer. (Dkt. No 6-1 at 16.) But its proposed order would prohibit American Honda from authorizing CMA to commence operations in West Virginia, supplying CMA with vehicles and parts, providing operational support, activating CMA in American Honda's dealer systems, and advertising the Martinsburg dealership. (Proposed Order, Dkt. No. 6-5 ¶ 1(a)–(d)). Whatever label Plaintiff places on its claims, the relief it seeks would prevent a dealership located and licensed in West Virginia from opening and operating there. Moreover, West Virginia has enacted its own establishment statute governing who may challenge a dealership located within West Virginia, and Plaintiff does not qualify for those protections. *See* W. Va. Code §§ 17A-6A-12, 17A-6A-3(11). Plaintiff therefore cannot use Maryland's general dealer protections to obtain the cross-border establishment veto that neither Maryland law nor West Virginia law provide.

2. Plaintiff's Allegations under Section 15-207(e) are Unlikely to Succeed and Provide no Basis to Enjoin the Proposed New Dealership.

In addition to Plaintiff's impermissible attempt to use these statutes extraterritorially, none of the statutes Plaintiff cites in its filings provide any basis for an injunction preventing the proposed new dealership from opening. First, Plaintiff goes to great lengths to convince this Court that it has grounds to enjoin the new dealership under Section 15-207(e) because American Honda's industry-standard methodology for evaluating dealer sales performance (RSE) allegedly is inappropriate. This argument, however, misses the mark for several reasons.

First, Section 15-207(e) simply does not apply to the establishment of a new dealership or provide existing dealers a right to challenge a new dealership in any way. The plain language of that statute makes clear that it applies solely to govern performance standards and processes that are used for measuring an existing dealership's performance. In particular, the statute expressly provides that it prohibits manufacturers from "requiring or coercing" an existing dealer "to adhere to performance standards that are not applied uniformly to other similarly situated dealers" and

requires "an assigned market area or a performance standard, sales objective, or program for measuring dealership performance" to be fair and reasonable. Md. Code Ann., Transp. § 15-207(e).[5] This statute does not define a "relevant market area" for dealers to challenge a proposed dealership, require written notice of a new dealership, address challenges to a new dealership, or provide criteria for determining good cause. This is exactly what the Maryland Court of Special Appeals held in *Antwerpen*. 117 Md. App. at 313–14, 699 A.2d at 1220 ("Section 15–207 does none of these things. Section 15–207 is not, as [plaintiff] contends, an RMA statute that gives [plaintiff] the right to challenge [the] establishment of a new dealer in proximity to [plaintiff].").

Second, RSE has nothing to do with this proposed new dealership. As Plaintiff concedes in its Motion, RSE is American Honda's standard for evaluating *an individual dealer's performance* with *its sales obligations* under its Dealer Agreement. (Dkt. No. 6-1 at 2, 9-10). It is not American Honda's methodology for evaluating the potential establishment of a new dealership. That determination instead is based on completely different factors and metrics, including, as discussed above, the brand's overall performance in a market, the location of competitive brand dealerships, demographic trends, and customer convenience. (Bearden Decl. ¶¶ 6-7; 19). Indeed, the Market Study enclosed with this filing does not consider Plaintiff's individual sales performance or even mention RSE a single time. (*See* Bearden Decl., Ex. A). Accordingly, this claim fails for the same reasons delineated in *Heritage*—American Honda did not apply RSE in making its decision to establish the proposed dealership, and even more importantly, had no obligation to do so under Section 15–207. *Heritage*, 264 F. Supp. 2d at 288

[5] In its Motion, Plaintiff contends that *Antwerpen* and *Heritage* no longer control because the legislature amended Section 15-207(e) more than a decade later to include the phrase "market area," which Plaintiff contends now "suppl[ies] precisely the protections the court found absent." (Dkt. 6-1 at 16-17). Not so. This amended phrase simply makes clear that the "market area" or "performance standard" used by a manufacturer "for measuring ***dealership performance***" must be compliant. Md. Code Ann., Transp. § 15-207(e). This statute still does not address the addition of a dealership, require notice of a new dealership, establish procedures for challenging a new dealership, or require good cause for a new dealership—exactly as the courts in *Antwerpen* and *Heritage* concluded.

(dismissing claim against manufacturer under this same section because "[i]t did not evaluate the performance of the existing dealerships in making this decision, so it could not have applied the performance standards unfairly" and because "[m]ore importantly, [it] was not required to apply such standards or show good cause before reactivating the open point.").

3. Plaintiff's Allegations under Section 15-206.1 are Unlikely to Succeed and Provide no Basis to Enjoin the Proposed New Dealership.

Plaintiff's claim under Section 15-206.1 fares no better. That statute provides that a manufacturer may not fail to act in good faith in (1) "acting or purporting to act under the terms, provisions, or conditions of any franchise agreement"; or (2) "any transaction or conduct governed by this subtitle." *Id.* § 15-206.1(b). Regarding the second prong, this Court previously has made clear that the opening of a new dealership "is not circumscribed by an RMA statute in the Transportation Article" and "[s]uch an act is therefore not a 'transaction or conduct governed by' that subtitle." *Heritage*, 264 F. Supp. 2d at 288. Similarly, Plaintiff's arguments under the Dealer Agreement fall flat. As discussed above, the general dispute resolution provision in the Dealer Agreement is wholly unrelated to the establishment of a new dealership, and even reading Section 17.8 in the light most favorable to Plaintiff, there is no dispute that American Honda met Plaintiff's self-declared "reasonable commercial standard" for evaluating a new dealership by preparing a 77-page "documented market study" based on reasonable criteria. (*See supra*, Section I.A).

Plaintiff therefore has little to no likelihood of success on this claim or any of its substantive claims related to the establishment of this new dealership,[6] and thus its request for an injunction preventing that dealership from opening should be denied.

[6] Plaintiff's filings assert a myriad of other statutory claims, including that its vehicle allocations have been unfair under Section 15-208(f) and that American Honda has not timely evaluated its succession under Section 15-211. American Honda will address these claims in due course. However, despite referencing these claims in the Motion, these statutes provide no basis for enjoining the opening of another Honda dealership across state lines in West Virginia and fail to support such relief for all the reasons set forth herein.

## II. Plaintiff Cannot Establish a Likelihood of Irreparable Harm.

In addition to failing to meet its burden above, Plaintiff cannot make the clear showing of likely irreparable harm required for a temporary restraining order or preliminary injunction. A plaintiff seeking preliminary injunctive relief must establish that irreparable injury is likely, not merely possible, in the absence of an injunction. *Winter*, 555 U.S. at 20, 22. "To establish irreparable harm, the movant must make a clear showing that it will suffer harm that is neither remote nor speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quotations omitted).

The irreparable-harm inquiry asks whether the asserted injury is one that subsequent relief, particularly monetary damages, cannot adequately redress. S*ee Lonza Walkersville, Inc. v. Adva Biotechnology Ltd.*, 581 F. Supp. 3d 736, 750 (D. Md. 2022) ("'[T]he irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address.'") (quoting *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012)). "The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). Indeed, where "there is even a possibility that adequate compensatory or other corrective relief will be available at a later date, a court should hesitate before concluding a plaintiff's harm is irreparable for purposes of granting a preliminary injunction." *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361, 372 (4th Cir. 2026) (quotation omitted) (hereinafter "*AFSCME*").

In an attempt to meet its burden on this issue, Plaintiff first invokes *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970), *Goldstein v. Miller*, 488 F. Supp. 156 (D. Md. 1980), and *DMF Leasing, Inc. v. Budget Rent-A-Car of Maryland, Inc.*, 161 Md. App. 640, 871 A.2d 639 (2005), analogizing its alleged harm to other cases where courts found preliminary

injunctive relief was warranted. Those cases, however, involved qualitatively different harms. *Semmes* involved the allegedly wrongful termination of a long-standing automobile franchise and allegations that its business would be shuttered if the termination took effect. 429 F.2d at 1205. *Goldstein* involved a plaintiff that alleged it would be "forced to go out of business" absent a stay. 488 F. Supp. at 175. Similarly, *DMF Leasing* held that the "total destruction" of a franchised business flowing from its termination could constitute irreparable injury justifying injunctive relief. 161 Md. App. at 652–53, 871 A.2d at 646. None of these decisions, however, involved the proposed establishment of a competing dealership. Moreover, in contrast to the above decisions, nowhere in its filings does Plaintiff allege that Hagerstown is at risk of termination, insolvency, going out of business, or shutting its doors if the new dealership is permitted to open. AHM is not terminating Hagerstown's franchise, and Hagerstown will remain authorized to sell and service Honda vehicles. (Bearden Decl. ¶ 10). The harm Plaintiff alleges is increased competition and the economic effects it predicts will follow. That is not the loss of the franchise or destruction of the business addressed in *Semmes*, *Goldstein*, and *DMF Leasing*.

Plaintiff's argument on irreparable harm further turns principally on ascertainability of damages. It argues that after CMA opens "no damages expert can reconstruct" what Hagerstown's sales, allocation, incentives, rankings, and other results otherwise would have been because the opening supposedly will "destroy[] the baseline against which damages would be measured." (Mem. Supp., Dkt. No. 6-1 at 19.) Contrary to this claim, however, the Maryland Court of Special Appeals has expressly recognized that an existing dealer seeking to challenge the proposed addition of a new dealership "has a sales history against which to measure damages in the event it loses business," a fact that Plaintiff cannot escape here. *Antwerpen*, 117 Md. at 307, 699 A.2d at 1217.

The Fourth Circuit's decision in *AFSCME* further undercuts Plaintiff's ascertainability claim. In that decision, addressing the very same ascertainability argument, the court held the plaintiffs failed to establish irreparable harm based on alleged difficulty in ascertaining damages. Similar to the arguments advanced in the Motion, the plaintiffs in *AFSCME* argued that damages stemming from a breach of privacy laws would be "insufficient" to make them whole and "difficult to ascertain," but the court found that despite these bare allegations the plaintiffs made "little effort to explain why that is so." *AFSCME*, 172 F.4th at 373. The court explained that "[t]he difficulty with that argument is that there are two forms of corrective relief that may be available down the line: money damages and a reparative permanent injunction." *Id.* The court reiterated Supreme Court precedent that "[i]f there is even a 'possibility' that 'adequate compensatory or other corrective relief will be available at a later date,' a court should hesitate before concluding a plaintiff's harm is 'irreparable' for purposes of granting a preliminary injunction." *Id*. at 372 (quoting *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)).

The reasoning in *Antwerpen* and *AFSCME* apply with equal force here, where there is no compelling showing that monetary damages cannot be later ascertained or that any of Plaintiff's alleged injuries are non-compensable. Plaintiff's own theory supplies the means of measuring the injury it predicts. Plaintiff claims that the establishment of this new dealership would cause it to lose vehicle sales, service, parts transactions, and warranty revenue, and cause downstream effects on allocation, incentives, rankings, and customer leads, and that damage from these loses is incalculable. (Dkt. 6-1 at 19; J. Ritchie Decl., Dkt. No. 6-2). However, Hagerstown's own exhibits demonstrate that both it and AHM track retail sales, service and parts activity, allocation, incentives, performance metrics, and other dealership results in granular detail. Hagerstown also has approximately thirty-five years of operating history against which post-opening results can be

compared—data Plaintiff itself relies on to quantify its current position. If Hagerstown ultimately proves a continuing unlawful allocation practice, performance-standard application, or other cognizable violation of the MVA, the Court can remediate any demonstrable harm through appropriate final relief. Any unlawful activity can be permanently enjoined and any resulting economic losses incurred while the case is pending can be measured and compensated. Simply put, all of Plaintiff's predicted damages are calculable and recoverable via money damages.

Nor does Plaintiff establish that its predicted cascade of future injury is likely rather than speculative. Plaintiff says the harm is already "underway" because CMA President and Chief Executive Officer Liza Myers Borches announced the coming Honda dealerships on LinkedIn and because CMA's Facebook page and comments state that the Martinsburg location is becoming a Honda dealership. (J. Ritchie Decl., Dkt. 6-2 at ¶ 10; Compl., Ex. L, Dkt. No. 1-13). Those materials establish that the opening has been publicly announced. They do not establish the asserted causal chain of permanent customer migration, reduced performance, reduced allocation, and further lost sales. Without evidence establishing those assumed causal links, Plaintiff offers a chain of contingent predictions, not the likely and imminent irreparable injury *Winter* requires.

Even accepting Plaintiff's premise that CMA's opening may divert some business from Hagerstown, Plaintiff's own theory describes economic consequences that are routinely measured against an extensive historical record, while its asserted allocation "feedback loop" rests on unsupported assumptions about how AHM's systems operate. To demonstrate a likelihood of irreparable harm sufficient to invoke the drastic remedy of injunctive relief, Plaintiff must make a clear showing that such permanent, incompensable loss is likely. *Winter*, 555 U.S. at 22. Plaintiff has not done so, and the Motion should therefore be denied.

## III. <u>The Balance of Equities Favors Defendants.</u>

The balance of equities also weighs against the requested injunction. In evaluating this factor, the Court must consider the harm that each side will suffer if the proposed relief is wrongly granted or wrongly withheld. *See Winter*, 555 U.S. at 24. Here, Plaintiff reprises its irreparable-harm theory in attempting to balance the equities: that (1) denial of the motion allegedly exposes Hagerstown to an incalculable and incompensable competitive injury, while (2) an injunction costs AHM only the "time value of a postponed business plan," and (3) any potential harm to CMA is discounted as "self-inflicted." (Pl.'s Mem. at 22.)

The court in *Antwerpen* rejected nearly the same framing. There, the trial court accepted at face value the incumbent dealer's claim that a new same-line dealership would cause it substantial lost business and found that the incoming dealer would suffer no harm as the result of an injunction. *Id*. at 306-07. The Maryland Court of Special Appeals vacated this ruling and held that the balance of equities favored the proposed dealer. In so holding, the court held that while the incumbent dealer "***possibly*** will lose a ***portion*** of its business if the injunction is not in place, Antwerpen Dodge is ***certain*** to lose ***all*** of its business with the injunction in place." *Id*. (emphasis in original). The court therefore held that the balance "tips decidedly" toward the proposed dealer. *Id*. at 308.

The same basic asymmetry exists here. If the requested injunction is denied, Plaintiff will continue operating its existing Honda dealership and will remain authorized to sell and service Honda vehicles. Indeed, nothing about the establishment of this new dealership prohibits Plaintiff from continuing to solicit existing customers or marketing to prospective customers, including in the Martinsburg area. Nor is Hagerstown prevented from competing for those customers through

vehicle pricing, trade values, financing, service pricing and quality, customer experience, advertising, or the customer relationships it admittedly has cultivated over thirty-five years.[7]

The potential effect of an injunction on CMA, by contrast, is absolute. Plaintiff's proposed order would prevent AHM from (1) authorizing CMA to commence Honda dealership operations, (2) supplying CMA with vehicles and parts, (3) providing leads or advertising and operational support, (4) activating CMA in AHM's dealer, warranty, allocation, Internet, and customer-referral systems, and (5) announcing or marketing the Martinsburg Dealership. (Proposed Order, ECF No. 6-5, ¶ 1(a)-(d)). These effects are even more pronounced here because AHM understands that CMA has relinquished the Chrysler Dodge Jeep Ram franchises previously operated from the Martinsburg location in preparation for its Honda operations. (Bearden Decl. ¶ 13). Moreover, CMA already has undertaken significant activities to convert its facility and prepare for business, (*id.*), and undoubtedly has incurred significant financial obligations associated with these activities. The harm here is significant, and as *Antwerpen* held, absolute.

Despite these undeniable effects on CMA, Plaintiff attempts to dismiss those consequences as "self-inflicted." (Pl.'s Mem. at 22.) This argument, however, fails for multiple reasons. First, Plaintiff has no substantive claims against CMA and only asserts causes of action against CMA for declaratory and injunctive relief. (Compl., Dkt. No. 1.) Moreover, the Fourth Circuit has rejected similar attempts to materially discount an enjoined party's harm merely because the movant characterizes that harm as self-created. *See The Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284-85 (4th Cir. 2002), abrogated on other grounds by *Winter*, 555 U.S. 7 ("[I]t is error for a district court to conclude that any harm that would be suffered by a defendant was self-inflicted

[7] Indeed, Hagerstown's emphasis on its "substantial" and long-established customer base cuts both ways. (Pl.'s Mem. at 18–19.) If those decades of relationships have created the strong goodwill and loyalty Hagerstown claims, Hagerstown enters the competitive environment with an approximately 35-year head start over a new Honda dealer.

and thus entitled to lesser weight in the balancing-of-the-harms portion of the preliminary injunction calculus."). Treating the defendant's costs as categorically irrelevant distorts the equitable comparison away from the proper consideration of the harm each side would suffer if relief is wrongly granted or denied. *Id.*

AHM similarly has substantial interests implicated by an injunction. AHM determined through its dealer-network planning process that the Martinsburg market warranted additional Honda representation. (Bearden Decl. ¶ 5). AHM's analysis concluded that Honda was underrepresented relative to competing brands in that market and that a Martinsburg dealership would improve customer access to Honda sales and service. (Bearden Decl. ¶¶ 6-9). Enjoining the Martinsburg dealership would block that decision and delay the legitimate objectives underlying the proposed new dealership: improved customer access and inter-brand competition.

Accordingly, the distinct imbalance of the equities is simply demonstrated by the following. If this injunction is denied and Hagerstown ultimately proves a cognizable violation, it will have been allowed to continue operating and its alleged losses will remain subject to compensation through money damages. On the other hand, if this injunction is granted and AHM/CMA instead prevail, CMA will have lost the opportunity to conduct any business while its commitments continued, and AHM will have suffered the loss of iterative sales, increased market representation, and improvement of brand goodwill. As in *Antwerpen*, the balance does not favor imposing an injunction to protect an incumbent from feared competitive effects.

## IV. <u>The Public Interest and Public Policy Favor Denial of a Preliminary Injunction.</u>

In addition to the facts above, the public interest and public policy also weigh heavily in favor of denying Plaintiff's request for injunctive relief. In support of its position on this factor, Plaintiff alleges that an injunction would promote Maryland's alleged policy of protecting dealers from specified manufacturer conduct and asserts that the public "loses nothing" if CMA's opening

is delayed. (Pl.'s Mem. at 22-23.) Contrary to this argument, however, Maryland law cannot be read to protect incumbent dealers from competition to the extent Plaintiff claims.

First, contrary to Plaintiff's argument, in *Central GMC, Inc. v. General Motors Corp.*, 946 F.2d 327, 332–35 (4th Cir. 1991), the Fourth Circuit recognized that Maryland's regulatory scheme must be construed in light of both protection against manufacturer abuses ***and*** the interest in "vigorous and healthy competition." The statutory scheme was not intended to insulate dealers from every adverse development in the marketplace. *Id.* at 334–35 ("We cannot read into that purpose an intent on the part of the Maryland legislature to make franchise ownership a virtually risk free endeavor at the cost of eviscerating an entire industry's ability to respond to changing market conditions."). That principle is especially pertinent where an incumbent dealer asks a federal court to prevent consumers from having access to an additional dealership—particularly given that Maryland has expressly chosen not to enact such rights.

Indeed, while the Transportation Article provides for a stay of manufacturer actions in certain circumstances (such as the termination of a dealer), the General Assembly has explicitly chosen not to enact any comparable right related to the proposed addition of a new dealership. *See Antwerpen*, at 312-14, 699 A.2d at 1220-21 (holding that the Transportation Article provides no such rights); *Heritage,* 264 F. Supp. 2d at 287-88 (holding that Maryland law does not require manufacturers to apply performance standards or establish good cause before activating the open point because Maryland had not enacted a RMA provision imposing those requirements). As *Antwerpen* and *Heritage* make clear, enjoining the establishment of a proposed new dealership (and one that is across state lines)[8] hardly serves the public interest and policy of Maryland given that Maryland has chosen not to enact any such protections.

---

[8] The interstate reach of Plaintiff's requested relief counsels particular caution as well. Plaintiff disclaims any attempt to regulate West Virginia property or a West Virginia-licensed dealer (Dkt. No. 6-1 at 16), yet its proposed order would

To the contrary, the public policy considerations here strongly favor the opening of a new dealership in Martinsburg. That new dealership brings with it increased economic development, increased competition and consumer choice, increased consumer access to vital services (like vehicle sales, warranty service, and recall service), stable employment for the community, and a host of other public benefits. These strong public interests and public policy initiatives are served only through the denial of Plaintiff's request for injunctive relief.

## CONCLUSION

For the foregoing reasons, American Honda respectfully requests that this Court deny Plaintiff's request for a temporary restraining order and/or preliminary injunction preventing the establishment of the proposed new dealership in Martinsburg, West Virginia.

*< Signatures on Following Page >*

---

prohibit AHM from authorizing and supporting that dealer's operations in West Virginia. (Dkt. No. 6-5 at ¶ 1(a)–(d)); *see supra* Section I.B.1. The public interest does not favor extending Maryland dealer protections beyond their territorial reach to suppress competition and consumer choice in West Virginia. Whatever rights Plaintiff ultimately proves concerning AHM's treatment of a Maryland dealer, the public interest does not favor converting those rights into a de facto Maryland veto over a West Virginia dealership.

*/s/ Deborah K. St. Lawrence Thompson*
Deborah K. St. Lawrence Thompson
(Federal Bar No. 25052)
Nelson Mullins Riley & Scarborough LLP
100 S. Charles Street, Suite 1600
Baltimore, Maryland 21201
Deborah.thompson@nelsonmullins.com
(443) 392-9403 – Telephone
(443) 392-9499 – Facsimile

*Attorneys for Defendant*
*American Honda Motor Co. Inc.*

Steven A. McKelvey, Jr.
(*pro hac vice* forthcoming)
Nelson Mullins Riley & Scarborough LLP
1320 Main Street
Meridian Building, 17th Floor
Columbia, South Carolina 29201
steve.mckelvey@nelsonmullins.com
(803) 255-9573 (Telephone)

Steven B. McFarland
(*pro hac vice* forthcoming)
Nelson Mullins Riley & Scarborough LLP
1320 Main Street
Meridian Building, 17th Floor
Columbia, South Carolina 29201
steven.mcfarland@nelsonmullins.com
(803) 255-9490 (Telephone)

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 21st day of August 2026, a copy of the foregoing was electronically filed via CM/ECF and served on all counsel of record and pursuant to the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Maryland.

/s/ *Deborah St. Lawrence Thompson*
Deborah St. Lawrence Thompson